<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

LESLIE PRINCE,                          :

        Plaintiff,           :

                   Civil Action No. 03-5434(JWB)

       v.                       :

HOWMET CORPORATION, a                   :        **O P I N I O N**

Delaware corporation,                   

                   :

        Defendant.           

                   :

**APPEARANCES**:

     ZATUCHNI & ASSOCIATES, LLC
     By:  David Zatuchni, Esquire
     2 Research Way, 3rd Floor East
     Princeton, New Jersey  08540
     (Attorneys for Plaintiff)

     LeBOEUF, LAMB, GREEN & MacRAE, L.L.P.
     By:  Mayra V. Tarantino, Esquire
     125 West 55th Street
     New York, New York  10019-5389

           - and -

     LeBOEUF, LAMB, GREEN & MacRAE, L.L.P.
     By:  Shelly R. Pagac, Esquire
     One Gateway Center
     420 Fort Duquesne Boulevard, Suite 1600
     Pittsburgh, Pennsylvania  15222-1437
     (Attorneys for Defendant)

**BISSELL**, <u>Chief Judge</u>

    This matter comes before the Court on a motion by defendant

Howmet Corporation ("defendant" or "Howmet") for summary

judgment, pursuant to Fed. R. Civ. P. 56, of plaintiff Leslie Prince's ("plaintiff" or "Prince") Complaint which claims retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et. seq. ("Title VII") (Count I), and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et. seq. ("NJLAD") (Count II); discrimination in violation of Title VII (Count III), and the NJLAD (Count IV); and violation of the Family and Medical Leave Act, 29 U.S.C. § 2611 et. seq. ("FMLA") (Count V). The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367(a). For the reasons set forth below, the Court denies Howmet's motion for summary judgment of plaintiff's retaliation claims (Counts I and II), denies Howmet's motion for summary judgment of plaintiff's discrimination claims (Counts III and IV), and grants Howmet's motion for summary judgment of plaintiff's FMLA claim (Count V).

<u>**FACTUAL and PROCEDURAL HISTORY**</u>

**I. Parties**

Plaintiff Prince resides in Newark, New Jersey. (Compl., ¶ 1). Prince is a 55 year old African-American male born in Guyana. (<u>Id</u>., ¶ 10). Prince holds an AA in Aviation Science, a BA in Political Science and a federal aviation license. (<u>Id</u>.)

Defendant Howmet is a Delaware corporation registered to conduct business in New Jersey, which is also the location of its

principal place of business.  (Id., ¶ 2).  Howmet produces
castings and machine components used in a wide array of
industries.  (Id.)

## II.  Procedural history

On November 18, 2003, Prince filed a Complaint with this
Court claiming that Howmet violated Title VII and NJLAD by
discriminating against him and by terminating him in retaliation
for his discrimination complaint.  (Compl., Cts. I-IV).
Furthermore, Prince's Complaint alleges that Howmet violated the
FMLA.  (Compl., Ct. V).  After the parties conducted initial
discovery, on December 30, 2004, Howmet filed the present motion
for summary judgment.

## III.  Background

On February 27, 2001, Joe Acree ("Acree"), Maintenance
Supervisor for Howmet, hired Prince as a Category "A" Mechanic
for Howmet's Maintenance Department.  (Compl., ¶¶ 11, 13).  As a
Category "A" Maintenance Mechanic, Prince performed routine
preventative maintenance on furnaces and heating and air
conditioning units, and any other maintenance of mechanical
equipment in the Alloy Division of Howmet's New Jersey location.
(Zatuchni Cert., Exh. A at 47; Exh. EE).  When Prince began
working for Howmet, he reported to Adrian Ace (Ace"), Maintenance
Groupleader, for the second shift between the hours of 3:00 P.M.
and 11:00 P.M.  (Zatuchni Cert., Exh. A ate 35).  Under Ace's

-3-

supervision, Prince performed his duties with no problems, receiving two positive evaluations for his performance. (Id., Exh. H, I). Ace commented that "Leslie gets along with other team members," "pays attention to safety very well," does a "good clean-up without being told," and is "always willing to help clean" the entire department as opposed to only his workstation. (Id., Exh. I). In August 2001, Prince received a six-month wage increase which changed his hourly rate from $18.00 to $19.50 an hour. (Id., Exh. A at 94).

A.  Prince's Discrimination Claim

In November 2001, Ace left Howmet. (Id. at 95). To fill the position of Maintenance Groupleader on the second shift, the position which was left open by Ace's departure, Howmet posted the opening. (Id., Exh. Q). The posting stated that candidates should have good job performance evaluations and attendance records. (Id.) The posting also listed four "minimum qualifications" of the candidate:

- Five years experience in Howmet or seven years experience in a previous leadership role.

- Ten years experience in plant maintenance. prefer supervisory experience and/or departmental knowledge.

- Must have strong leadership skills. Must have strong verbal and written communication skills.

- Must be honest and sincere.  Must be self-starting and results oriented.

(<u>Id</u>., Exh. Q).  Furthermore, under the "Critical Skills/Expertise" section of the posting, the candidate was required to have "[k]nowledge of high vacuum systems and induction furnaces, [and] ... be able to coach and counsel team members."  (<u>Id</u>.)

Prince asserts that he was qualified to fill the position due to his years of experience as supervisor and manager in maintenance prior to being employed by Howmet.  (<u>Id</u>., Exh. F at 12-13).  Moreover, Prince's management background was acknowledged by Acree.  (<u>Id</u>., Exh. C at 23).  Additionally, at the time Howmet posted the Maintenance Groupleader position, Prince had been working in the Alloy Division for approximately 10 months and Ace commented that Prince had "good job knowledge." (<u>Id</u>., Exhs. H, I).  Furthermore, Prince's attendance record indicated that he missed three work days due to illness and arrived tardy once in 10 months before applying for the position.  (<u>Id</u>., Exh. Q).  Accordingly, based on the above criteria, Prince contends that of the four candidates who applied for the position, he was the most qualified.

In addition, Prince alleges that Acree used a disparate and inconsistent interview process and method to determine who would fill the position, which ultimately discriminated against all the African-American candidates.  For example, Acree's interview

evaluation of Prince indicates that "[Prince was] doing well
[and] needs more experience on alloy equipment, vacuum furnaces."
(Id., Exh. Q).  Acree, however, was aware that Prince had
experience working with alloy equipment and furnaces because of
his 10 months of experience in the Alloy Division compared to
Nieswand's experience with air conditioning and refrigeration
units in the Casting Division.  (Id., Exh. A at 32-33).
Moreover, one reason why the other two African-American
candidates were ultimately not selected for the position was
their attendance records.  (Defendant's App., Exh. B at 29-33).
Acree, however, conceded that he did not review Nieswand's
attendance record; nor did he discuss his performance, attendance
or aptitude with Nieswand's supervisor Manuel Sanchez (Sanchez").
(Zatuchni Cert., Exh. A at 33-34; Exh. P).  Further, Lastra, who
had final approval of promotional decisions, stated that in
making a determination between two candidates she "would approve
the person with 20 years supervisory experience over the more
senior employee." (Id., Exh. B at 16-17).

     Howmet, however, disagrees with Prince's assessment of the
hiring process.  First, Howmet declined to select two of the four
candidates due to their lack of required qualifications and poor
attendance records.  (Defendant's App., Exh. B at 29-33).
Second, Howmet claims that it based its selection of Steven
Nieswand, a White male working in the Casting Division on air

conditioning and refrigeration units, over Prince due to more than seven months of seniority. (Id. at 33). Specifically, Nieswand began working for Howmet on July 10, 2000 (id., Exh. E at 9) while Prince began on February 27, 2001. (Id., Exh. A at 36). Further, Acree, the same person who hired Prince and Robert Cutcher ("Cutcher"), made the decision as to who would fill the vacant position. (Id., Exh. B at 28-29; Exh. C at 58-59). Lastly, Howmet argues that until Nieswand gave him a performance evaluation in May 2002 Prince had not informed Howmet of any racial problems, filed any complaints against Nieswand, or suggested that he did not receive the Maintenance Groupleader position due to race. (Id. Exh. A at 85, 122-23).

## 1.  Prince's Performance Evaluation Complaints

Prince alleges that upon being promoted to the Maintenance Groupleader position, Nieswand began a pattern of discriminatory and harassing treatment towards him based on race. (See id., Exh. V). Prince claims that Nieswand, without reason, criticized his attitude, safety precautions and ability to do work, and denigrated him at any opportunity. (Id.) Prince alleges that Nieswand's treatment culminated in a negative performance evaluation after only having been his supervisor for less than three months, which is in contrast to the prior evaluations received from Prince's previous supervisor. (See id., Exhs. H, I, J, V). In addition, Nieswand stated that he made several of

-7-

his assessments of Prince's performance based on discussions with other team leaders, but the only other team leader who worked with Prince was Ace, and Nieswand admitted to not having reviewed Ace's evaluations. (<u>Id</u>., Exh. E at 18).

On May 6, 2002, due to his dissatisfaction with receiving a negative performance evaluation from Nieswand compared to Ace's evaluation, Prince submitted a letter to Acree expressing his belief that racial discrimination had occurred. (<u>Id</u>., Exh. K). Specifically, Prince's letter stated:

> The events that transpired on Thursday, May 2, 2002 [referring to his meeting with Nieswand on job performance] though how brief it may be, has cause some irreparable damage to my credibility, character, and my confidence in [Howmet] in regards to Fairness and the Legal Germ "EEO".
>
>            \*   \*   \*
>
> Joining Alcoa-Homet, one would say was a step down, but it is a job, that I am prepared to do....
>
>            \*   \*   \*
>
> If honesty and fairness is unbiased, it is clear that Steve does not, and will not reach the requirement of a Team Leader for the Maintenance Department.
>
> I say this after a [sic] carefully observing his performance, perception, knowledge of the task he has been assigned to.  The conclusion that he has drawn of me is typical, of a Bigot; his Bias assessment of my ability and skills is a clear case of Social Deviant Behavior.
>
>            \*   \*   \*

-8-

> I have refused to enter into any further
> dialogue with him on issue of my review.  ...
> For the following reasons, he has no time
> experience in the position, he occupies, he
> lacks leadership, he is untrustworthy, and he
> lies ... [about acts] that cannot be
> substantiated.  Where there should be
> documentary evidence....

(Defendant's App., Exh A at Prince Exh. 11).  Prince's letter also stated that Nieswand had ordered him to perform unsafe acts, which he refused to complete.  (Id.)

Prince alleges that following the submission of the above letter, Nieswand created three documents entitled "Hourly Performance Appraisal Comments."  (Zatuchni Cert., Exh. E at 31-32; Exh. J).  Moreover, Prince claims that Nieswand created other documents labeled "Disciplinary Action Memo - April 16, 2002," "Leslie Prince May 7, 2002" and "Leslie Prince May 8, 2002" after Prince submitted his letter complaining of discrimination.  (Id., Exh. E at 25-26; Exh. N).  Prince alleges that the memo dated April 16, 2002 was not drafted until late May 2002 and thus was back-dated by Nieswand.  (See id.)

Following Prince's submission and circulation of his letter claiming discrimination, Howmet asserts that Lastra conducted an investigation into the allegations raised in the letter.  (Defendant's App., Exh. D at 23-25, 41-42).  Specifically, Howmet contends that a meeting on May 10, 2002 between Cutcher, Lastra, Nieswand and Prince was held to discuss those allegations.  (Id., Exh. A at 181-82, 268).  Prince, however, claims that Howmet did

not conduct an investigation; rather, the purpose of the meetings following the submission of the letter was to focus on Prince's purported inept performance. (See id., Exh. D at 47; Exh. B at 27). Prince alleges that Howmet did not interview any employees or engage in other investigative efforts to determine whether Prince had experienced discrimination, such as interviewing other mechanics and employees concerning his discrimination and harassment complaints. (See id., Exh. B at 22-28; Exh. C at 41-42; Exh. D at 46-47). Instead, Lastra questioned Steve Fromkin ("Fromkin"), the Safety Director, whether Prince had been requested to perform unsafe acts as Prince alleged in his letter. (Defendant's App., Exh. D at 24-25). Fromkin opined that Prince had not been ordered to perform any unsafe acts. (Id.)

After the May 10, 2002 meeting, Howmet alleges that Prince did not have any further problems with Nieswand, nor did it believe that Nieswand had discriminated against him. (Id., Exh. A at 187-91). On May 17 and 18, 2002 Acree and Nieswand met with Prince to discuss his job performance review; however, Prince allegedly refused to sign and accept the review. (Id. at 269). On May 23, 2002, Howmet agreed to re-evaluate Prince's performance in three months; a review was scheduled for August 16, 2002. (Id., Exh. B at Acree Exh. 15; Exh. A 269-70).

## 2.  Prince's Retaliation Complaint

Prince claims that in retaliation for his discrimination

complaint, Howmet transferred him to a night shift.
Specifically, approximately one month and a half after Prince
submitted his complaint of discrimination, he was transferred to
the "graveyard" shift (11:00 P.M. to 7:00 A.M.). (Id., Exh. A at
192; Exh. F, ¶¶ 7-8). Howmet alleges that this transfer was
necessary and that it had been reducing its workforce due to the
economic impact of the September 11, 2001 terrorist attack on the
United States and a reorganization that had occurred in July
2002. (Id., Exh. A at 191-92; Exh. B at Acree Exh. 1; Exh. F, ¶
5). Howmet further asserts that Prince's new shift did not
result in any loss of pay, nor did it modify his
responsibilities. (Id., Exh. F, ¶¶ 7-9). Prince, however,
disputes Howmet's argument by alleging that Howmet did not
eliminate his position on the day shift, advertised its vacancy
and, shortly after his transfer, filled it with another mechanic.
(Zatuchni Cert., Exh. A at 193).

Prince also alleges that informing Howmet's EEO office of
his discrimination complaint was another factor that led to his
termination. Prince alleges he informed Howmet's EEO officer of
his discrimination complaint a week prior to his termination
while attending an EEO on-site training seminar. (Id., Exh. A at
76). Particularly, Prince claims that Lastra became frustrated
and upset that Prince had communicated his complaint of
discrimination to the EEO officer. (Id., Exh. A at 76-81).

### 3.  Howmet's Reason for Terminating Prince

On July 24, 2002, a week after Prince informed the EEO officer of his discrimination complaint, Howmet terminated him. (Id., Exh. A at 209; Defendant's App., Exh. C at Cutcher Exh. 17 at 3).  Howmet alleges that the reason for Prince's termination was his destruction of company property.  (Defendant's App., Exh. B at 54, 65-66; Exh. C at Cutcher Exh. 17 at 4)  Specifically, on July 23, 2002 Acree was informed that Prince had cut the lock off another mechanic's toolbox and used an extension cord found in the tool box without the mechanic's permission.  (Id.) Howmet's employee handbook indicates that destruction of company property is grounds for termination.  (Id., Exh. C at 27). Acree, along with Steven Allaman, Prince's midnight shift supervisor, met with Prince to discuss the incident.  (Id., Exh. A at 205, 226-227).  Prince admitted that he cut the lock, but offered no explanation for this action.  (Id., Exh. A at 225-26). Acree also inquired and confirmed with other mechanics that they would not cut the lock off another mechanic's tool box. (Zatuchni Cert., Exh. C at 56-57).  Moreover, Acree and Lastra were not aware of any other person who had cut the lock off another mechanic's toolbox.  (Id., Exh. B at 40; Exh. C at 56-57).  In addition, Howmet reviewed Prince's conduct and noted that a white male was terminated in 1996 for the destruction of a company forklift.  (Id., Exh. C at 27; Exh. D at 32-33).

Consequently, on July 24, 2002 Acree, Lastra and Cutcher, the same individuals who hired Prince, terminated him for the destruction of company property. (Id., Exh. B at 58; Exh. C at Cutcher Exh. 17 at 3).

Prince, however, alleges Howmet's reasons for his termination are pretextual because he had a legitimate reason for his actions and acted in the best interests of the company. Particularly, Prince asserts that he cut the lock off a company kit (not another mechanic's toolbox) that contained an electrical cord for an emergency that would have caused substantial damage to Howmet's machinery. (Zatuchni Cert., Exh. A at 201-202, 265). Moreover, Prince claims that once he completed the emergency repair work he returned the cord and replaced the lock. (Id., Exh. A at 201-207). Further, Prince asserts that he cut the lock that was wrapped around a company owned electrical cord, which was wrapped around the top of another mechanic's toolbox and thus cutting that lock did not give him access to another mechanic's tool box. (Id. at 202-205, 221-22).

In addition, Prince alleges that it is common practice among mechanics to cut off locks that barred access to a company tool bin whenever a key was unavailable. (Id., at 206, 233-34). Prince also asserts that Howmet has been inconsistent with the treatment of employees who have damaged or destroyed company property. For example, Yuri Bushmani ("Bushmani"), a Howmet

-13-

employee, flooded a furnace by wrongfully opening a pipe, but was not terminated; rather, Bushmani was assigned to complete tasks away from a furnace. (<u>Id</u>., Exh. A at 235-36).  Additionally, Daryl Winkels, another employee, cut up a Fox Barline machine, but was not reprimanded or disciplined for damaging the machine. (<u>Id</u>.)  Therefore, Prince claims that Howmet's reason for terminating him were pretextual and in fact motivated by discrimination complaints.

   B.  <u>Prince's FMLA Claim</u>

   In addition to his discrimination and retaliation complaints, Prince alleges that Howmet violated his FMLA rights. On November 21, 2001, when Prince removed a filter off a furnace to perform preventative maintenance, metallic dust entered his left eye.  (<u>Id</u>., Exh. A. at 95; Exh. Y).  Prince immediately went to the Howmet medical center, where a medic attempted to flush the metallic dust out of his eye.  (<u>Id</u>., Exh. A at 96-97, Exh. CC).  The flushing did not remove the debris and Prince was taken to the local emergency room, St. Claire's Hospital in Dover, New Jersey.  (<u>Id</u>.)  At the emergency room a doctor removed the metallic dust from Prince's eye.  (<u>Id</u>.)  The hospital released Prince later that evening and provided him with a patch to cover his left eye.  (Zatuchni Cert., Exh. A at 98).  The next day, Prince received a phone call from Acree directing him to report to work.  (<u>Id</u>. at 99).  Before reporting to work, Prince visited

-14-

Dr. Bellamy, Howmet's on-staff doctor, who prescribed pain medication to manage the pain in his left eye and provided another eye patch. (<u>Id</u>. at 99-100, 102).

Prince claims that, over the course of several months, his left eye deteriorated and developed a pterygium, a red and inflamed tissue growth. (<u>Id</u>., Exh. X). In March 2002, Prince was referred by his normal eye doctor for specialized care for this condition and was informed that surgery may be necessary. (<u>Id</u>., Exh. A at 219; Exh. Z). Prince continued to visit his eye care specialist receiving treatment for pain management in April, May and June of 2002. (<u>Id</u>., Exh. Y). Prince alleges that he missed work on April 18, 19 and 20, 2002 because of extreme pain in his left eye. (<u>Id</u>., Exh. BB). Furthermore, Nieswand and Acree testified to witnessing Prince experience pain from his eye and observing him use eye drops to manage the pain. (<u>Id</u>., Exh. C at 27; Exh. E at 17).

Howmet disputes Prince's assertion of continued medical treatment for his eye condition. Particularly, Howmet argues that on May 11, 2002 Prince submitted a doctor's note indicating that he was being treated for "fatigue". (Defendant's App., Exh. A at Prince Exh. 13). Further, Prince's medical records for that date state that he "walked in. States he feels fatigue - does not feel like going to work, per Dr. Paige. Note Given." (<u>Id</u>., Exh. J). In addition, Prince's diary indicates that from May 11-

16 he was able to perform routine daily activities.  (<u>Id</u>., Exh. K).  For example, on May 14, 2002, a day Prince was scheduled to work, he filed a claim against Sprint PCS at the courthouse, took his wife downtown, picked up his daughter and worked on  his computer.  (<u>Id</u>.)  On May 15, 2002, another day that he was scheduled to work, Prince worked on developing a short report, took his wife to the bulk fleet, picked up his daughter and spent time e-mailing a friend.  (<u>Id</u>.)  Thus, Howmet contends that Prince was not in consistent treatment nor did he suffer from any disability for his alleged eye injury.

Nonetheless, to treat his eye condition, Prince scheduled surgery for July 2002.  (<u>Id</u>., Exh. A at 210-11).  At Howmet's request, Prince signed a release form for Dr. Bellamy to contact Prince's eye care specialist.  (<u>Id</u>., Exh. AA).  Following this authorization, all of Prince's medical documents were forwarded to Howmet in support of his worker's compensation claim and to excuse him for being absent on several days.  (<u>Id</u>., Exh. Y). Prince claims that Howmet disregarded this paperwork and determined that there was no correlation to his original on-the-job eye injury; therefore, the injury was not compensable.  (<u>Id</u>., Exh. AA).

Prince also met with Lastra who provided him with Howmet's FMLA paperwork during the month of July 2002.  (<u>Id</u>., Exh. A at 123-24, 210-11).  Howmet, however, argues that Lastra did not

provide Prince with any FMLA documentation; rather, Johanna
Trepiccione ("Trepiccione"), a Senior Human Resource
Representative at Howmet, provided Prince with the FMLA
paperwork.  (Defendant's App., Exh. P at Trepiccione Aff., ¶¶ 5-
6). On July 25, 2002, Prince was terminated, lost his insurance
benefits, became unable to afford continuous treatment and,
therefore, cancelled his surgery.[1]  Prince also alleges that
Lastra stated that should he attempt to obtain medical service
under Howmet's insurance plan she would "call the cops" and that
Lastra failed to inform him of his COBRA benefits.  (Id. at 224).
Hence, Prince asserts that Howmet violated his rights under the
FMLA.

## DISCUSSION

Defendant moves for summary judgment on all of plaintiff's
claims.  The Court, for the purpose of organization and clarity,
will begin discussing plaintiff's claim of discrimination on the
basis of race.  Thereafter, the Court will address plaintiff's
claims of retaliation and the FMLA violation.

## I.  Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary
judgment should be granted "if the pleadings, depositions,

---

[1]      The Court notes that Prince was scheduled to have
surgery to correct or repair his eye on February 14, 2005, but
the Court has not been informed of the outcome of that procedure.
(See Plaintiff's Br. at 18).

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir.) (en banc), cert. dismissed, 483 U.S. 1052 (1987).  In deciding a motion for summary judgment, a court must view the facts in the light most favorable to the nonmoving party and must resolve any reasonable doubt as to the existence of a genuine issue of fact against the moving party.  See Continental Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982).  The moving party has the burden of establishing that there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

The Supreme Court has stated that, in applying the criteria for granting summary judgment:

> [t]he judge must ask ... not whether ... the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented.  The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].  The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict ....

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  A fact is "material" only if it will affect the outcome of a

-18-

lawsuit under the applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party.  (Id.)

>    A.   Discriminatory Failure to Promote
>         on the Basis of Race

Prince alleges discrimination on the basis of race in violation of Title VII and NJLAD.  Title VII makes it unlawful for an employer to discriminate against any individual with respect to either compensation or terms, conditions or privileges of employment on the basis of race.[2]  42 U.S.C. § 2000e-2(a).

A Title VII discrimination claim must be analyzed under the burden-shifting framework in which the plaintiff has the initial burden of establishing a prima facie case of employment discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Under McDonnell Douglas, a plaintiff must demonstrate a prima facie case by establishing:  (1) that he or she belongs to the protected group; (2) that he or she was qualified for the job; (3) that he or she was terminated in spite of his or her qualifications, and (4) that the circumstances of

---

[2]      The Court acknowledges that the Supreme Court of New Jersey "has adopted the McDonnell Douglas approach as a starting point in analyzing claims under the LAD."  Bergen Commercial Bank v. Sisler, 157 N.J. 188, 194 (1999).  Likewise, the elements of a retaliation claim under Title VII are parallel to those of a retaliation claim under the NJLAD.  See Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001).  Accordingly, the Court will examine Prince's federal and state discrimination and retaliation claims utilizing the McDonnell Douglas framework.

his or her termination would lead to an inference of unlawful discrimination.  (<u>Id</u>.)  Once the plaintiff has demonstrated a <u>prima facie</u> case, then the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the personnel action.  (<u>Id</u>.)  Finally, the plaintiff bears the burden of showing that the articulated reason for the action was simply pretextual.  (<u>Id</u>.)

The Court of Appeals for the Third Circuit has further elaborated on the standard that a plaintiff must meet to survive summary judgment under <u>McDonnell Douglas</u>.  Once the plaintiff has made a <u>prima facie</u> case, and the defendant has countered with a legitimate, nondiscriminatory reason, "plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  <u>Fuentes v. Perskie</u>,32 F.3d 759, 764 (3d Cir. 1994).  In other words, a plaintiff may survive summary judgment by either "(1) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  (<u>Id</u>.)  The plaintiff's evidence "must allow a factfinder reasonably to

infer that each of the employer's proffered non-discriminatory reasons ... was either a post hoc fabrication or otherwise did not actually motivate the employment action." (Id)

Howmet does not contend that Prince has failed to make out a prima facie case of discrimination because he belongs to a protected class.  Assuming, arguendo, that Prince has set forth a prima facie case, a rational juror could determine that Howmet's proffered reason for denying Prince a promotion is pretextual. Howmet asserts that two of the four candidates for the Maintenance Groupleader position, who happen to be African-American, were disqualified for their poor attendance records. Howmet also purports to have selected Nieswand over Prince because he had more seniority, which is an undisputed legitimate, nondiscriminatory reason.  Both Prince's and Nieswand's hire and seniority dates were noted on their Request for Consideration for the groupleader position.  Howmet, however, does not counter Prince's dispute that he was the more qualified candidate based on prior managerial experience and his familiarity with the Alloy Division.  In addition, Howmet has not provided evidence that Nieswand met the other essential qualifications, such as previous managerial experience and familiarity with vacuum systems and induction furnaces.  Moreover, Lastra conceded that in making a hiring decision she would choose the more experienced candidate over the senior candidate.  Additionally, Acree admitted that he

-21-

did not inquire about Nieswand's attendance record compared to his inquiries into the African-American candidates' attendance records, which included Prince.  Furthermore, Prince provided evidence that he received satisfactory job evaluations from his supervisor in the Alloy Division, which Howmet reviewed as part of the interview process to fill the groupleader vacancy.  As such, a reasonable juror could reject Howmet's articulated reason for denying Prince the promotion and selecting Nieswand.  A reasonable factfinder could also believe that a discriminatory reason was more likely than not a motivating or determinative cause of Howmet's actions.  Therefore, the motions for summary judgment are denied with respect to Counts III and IV.

   B.  Retaliation Claim

   Prince alleges that Howmet took adverse actions against him for bringing a race discrimination complaint.  Prince's retaliation claims are brought pursuant to 42 U.S.C. § 2000e-3(a) and NJLAD (which as stated above follow the same analysis).  Title VII in relevant part provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  To establish a prima facie case of

retaliation, a plaintiff must demonstrate that:  (1) he or she engaged in an activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his or her participation in the protected activity and the adverse employment action.  <u>Kachmar v. SunGard Data Sys., Inc.</u>, 109 F.3d 173, 177 (3d Cir. 1997).  To prevail on a motion for summary judgment, the defendant "must show that the trier of fact could not conclude, as a matter of law, (1) that retaliatory animus played a role in the employer's decisionmaking process and (2) that it had a determinative effect on the outcome of that process."  <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 501 (3d Cir. 1997).  "If the employer comes forward with evidence showing some legitimate non-retaliatory reason, the employee still has the opportunity to produce evidence sufficient to persuade the factfinder of a preponderance of the evidence that the employer nevertheless harbored a discriminatory intent."  <u>Delli Santi v. CNA Ins. Companies</u>, 88 F.3d 192, 199 (3d Cir. 1996).  In other words, summary judgment will be granted for the defendant if it offers a legitimate non-retaliatory reason for the adverse employment action and if the plaintiff is unable to raise a genuine issue of material fact on the question of whether the legitimate reason is a pretext for retaliation.  <u>Krouse</u>, 126 F.3d at 501.

Prince contends that as a result of (1) his letter alleging

-23-

discriminatory practices by Nieswand and (2) his conversation with Howmet's EEO officer, he was subjected to retaliatory harassment from May 2002 until his termination in July 2002.  As evidence of this, Prince points to the disciplinary memoranda, his transfer to the "graveyard" shift and, ultimately, his termination due to his discrimination complaint.

To establish an 'adverse employment action" of retaliation, the Third Circuit has held that a plaintiff must demonstrate "that the retaliatory conduct rise[s] to the level of a violation of U.S.C. § 2000e-2(a)(1)." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300-01 (3d Cir. 1997).  "[R]etaliatory conduct ... is [] proscribed by Title VII only if it alters the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities,' or 'adversely affects his [or her] status as an employee.'" (Id., at 1300 (quoting 42 U.S.C. § 2000e-2(a)).  Furthermore, a close temporal proximity between protected conduct and an adverse employment action supports an inference of retaliatory motive. Bowles v. City of Camden, 993 F. Supp. 255, 263 (D.N.J. 1998).  The Third Circuit, however, has warned that the timing of the action taken, without more, is not enough to establish a causal link. Williams v. Philadelphia Hous. Auth. Police Dep't., 380 F.3d 751, 759-60 (3d Cir. 2004).

In the present case, it is undisputed that the alleged

adverse employment actions taken against Prince, including his
termination, occurred shortly after Prince submitted his
discrimination complaint.  Howmet's disciplinary reprimands and
Prince's move to the "graveyard" shift, however, did not impact
his compensation, terms, conditions or privileges of employment.
Howmet also presented a legitimate, nondiscriminatory reason for
transferring prince to the "graveyard" shift, a reduction in
workforce and reorganization of the company.  Nonetheless, Howmet
has failed to counter Prince's contention that Howmet posted the
day-shift position that he vacated which another mechanic
immediately filled.  This creates a genuine issue of fact
regarding whether the defendant's articulated reason for moving
plaintiff to the "graveyard" shift is pretextual.  Even if that
shift change is not the sort of action which alone could support
a retaliation claim, the evidence reviewed above may well be
admissible on the retaliatory discharge claim.

Regarding Howmet's asserted reason for terminating Prince,
there are also genuine issues of material fact that should be
resolved by the trier of fact.  Howmet asserts that the reason
for Prince's termination was his destruction of property.  Prince
admits that he cut the lock; however, he asserts that it was not
the lock of another mechanic and that he cut the lock because of
an existing emergency.  Howmet argues that Prince should not be
allowed to raise the issue of an emergency because when

originally questioned by his supervisors he failed to raise this excuse. (Indeed, he allegedly did not raise it until his deposition in this action.) While the Court is persuaded by Howmet's argument that such an excuse should have been raised or documented by Prince when he was originally questioned, the failure to do so is not an automatic reason for Howmet's motion to prevail. Rather, this fact may affect Prince's credibility should he assert this explanation at trial. Prince has also raised other material issues of fact that should be resolved by the trier of fact. For example, Prince indicates that in the past, two other Howmet employees destroyed company property, yet were not terminated. Also, the only other employee that was terminated for destroying company property destroyed a forklift which is much more expensive than a padlock. Accordingly, there is sufficient evidence in the record to permit a reasonable juror to infer that Howmet's alleged legitimate, nondiscriminatory reasons for adverse actions taken against Prince are pretextual and, therefore, the real reason is retaliatory. Hence, Howmet's motions for summary judgment with respect to Counts I and II are denied.

### C.  FMLA Claim

Prince contends that the injury to his left eye constitutes a serious health condition under the FMLA because he experiences episodic periods of incapacity related to the injury. The

record, however, does not demonstrate that Prince's eye injury prevents him from performing regular daily activities when his eye bothers him.  The FMLA defines a serious health condition as "an illness, injury, impairment, or physical or mental condition that involves (A) in-patient care in a hospital, hospice or residential medical care facility; or (B) continuing treatment by a healthcare provider."  29 U.S.C. § 2611 (11).  The regulations define these requirements as follows:

> (a)  For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves:
>
>> (1)  Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity (for purposes of this section, defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) or any subsequent treatment in connection with such inpatient care; or
>>
>> (2)  Continuing treatment by a health care provider.  A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
>>
>>> (I)  A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive

-27-

calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A)  Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(B)  Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

\* \* \*

(iii)  Any period of incapacity or treatment for such incapacity due to a chronic serious health condition.  A "chronic serious health condition" is one which:

(A)  Requires periodic visits for a treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

(B)  Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(C)  May cause episodic rather than a continuing period of

                              incapacity (e.g., asthma,
                              diabetes, epilepsy, etc.)

                         *   *   *

              (b)  Treatment for purposes of paragraph (a)
         of this section includes (but is not limited
         to) examinations to determine if a serious
         health condition exists and evaluations of
         the condition.  Treatment does not include
         routine physical examinations, eye
         examinations, or dental examinations.

                         *   *   *

              (e)  Absences attributable to incapacity
         under paragraphs (a)(2)(ii) or (iii) qualify
         for FMLA leave even though the employee or
         the immediate family member does not receive
         treatment from a health care provider during
         the absence, and even if the absence does not
         last more than three days ....

29 C.F.R. § 825.114.

     Arguments by both sides have focused the Court's attention

on the only arguable basis for the FMLA claim in this case:

whether the uncontested facts could establish that plaintiff

suffered from a "chronic serious health condition," as

contemplated by subsection (iii) noted above, that generated a

"period of incapacity."[3]  This Court concludes that there are no

genuine issues of material fact to preclude a determination that

plaintiff did not suffer from a "chronic serious health

condition" and did not experience a "period of incapacity" due to

_____

          [3]   It is undisputed that plaintiff did not require
inpatient care and was not incapacitated for a period of
"more than three consecutive calendar days."

his eye condition.

While the Court notes that Prince sees a doctor when his eye irritates him, there is no evidence in the record that those visits and the prescription provided by the doctor incapacitate him in any way.  Additionally, Prince's doctor's notes and the medical documents do not mention that his eye injury constituted a chronic serious health condition.  Furthermore, Prince's medical documents indicate that his eye condition can be corrected by surgery and is thus not incurable.  Moreover, Prince discussed his eye injury with personnel at Howmet in May 2002, but never completed the proper FMLA documentation.  In addition, Prince requested the FMLA paperwork and Trepiccione provided the documents to him.  In sum, Prince's FMLA claim (Count V) is denied as a matter of law because his eye injury does not satisfy the definition of a "chronic serious health condition," plaintiff failed to establish any applicable "period of incapacity," and he never completed the required FMLA documentation to determine whether his request would be granted.

## CONCLUSION

Based on the foregoing reasons:  the Court denies Howmet's motion for summary judgment on plaintiff's retaliation claims (Counts I and II); denies Howmet's motion for summary judgment on

plaintiff's discrimination claims (Counts III and IV); and grants

Howmet's motion for summary judgment on plaintiff's FMLA claim

(Count V).[4]


                                        /s/   John W. Bissell
                                          JOHN W. BISSELL
                                            Chief Judge
                                    United States District Court


DATED:  April 28, 2005

_____

        [4]      Whether evidence of plaintiff's eye condition, and its
potential expense and inconvenience to the defendant employer (if
any), played a role regarding plaintiff's claim for retaliatory
discharge (particularly if known to the decision makers) may be
explored at trial.